DEPARTMENT OF LOCAL GOV-
ERNMENT FINANCE, Appel-
lant (Respondent Below),

v.

Michael GRIFFIN and Lake County,
Appellees (Petitioners Below).

No. 49S10–0209–TA–489.

Supreme Court of Indiana.

March 5, 2003.

⚷43

Steve Carter, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Gerald M. Bishop, John S. Dull, Edward R. Hall, Merrillville, IN, Julia Blackwell Gelinas, Thomas Wheeler, II, Indianapolis, IN, Attorneys for Appellee.

Timothy Kennedy, Angela Smith, Hall, Render, Killian, Heath & Lyman, P.S.C., Indianapolis, IN, Attorneys for Amicus Curiae.

SHEPARD, Chief Justice.

Michael Griffin requested a tax refund of the real property taxes he paid toward Hospital Care for the Indigent for the 1996–1998 tax years. It was denied. Griffin appealed to the Indiana Tax Court, claiming among other things that the tax violates Article 10, § 1 of the Indiana Constitution. The Tax Court agreed. It is apparent that the system devised by the legislature protects local taxpayers from open-ended liability for indigent care and also apportions local costs with local benefits. We conclude that the tax is constitutional, and thus reverse.

### Facts and Procedural History

Griffin is clerk-treasurer for the Town of Highland and an owner of property in Lake County. On January 12, 2000, Griffin filed two 17T Forms with the Lake County Auditor requesting a refund for the taxes he paid toward Hospital Care for the Indigent ("HCI") for 1996, 1997, and 1998. During these three years, Lake County's tax rate for HCI ranged from $0.4824 to $0.5024 per $100 of assessed value. *Griffin v. Dept. of Local Gov't Fin.*, 765 N.E.2d 716, 718 (Ind.Tax Ct.2002). The formula for the HCI tax rate is based on an extrapolation of historical HCI costs in each particular county,[1] thus producing disparate rates from county to county. *See State Bd. of Tax Comm'rs v. Montgomery*, 730 N.E.2d 680, 681 (Ind.2000); *Griffin* 765 N.E.2d at 720.

In his refund claim, Griffin asserted that disparity between counties rendered the HCI tax illegal and unconstitutional. Therefore, he requested a review of his taxes by the Department of Local Government Finance pursuant to Ind.Code. § 6-1.1-26-2.

The Department held a hearing in which Griffin claimed that the HCI tax violated Ind. Const. art. 10, § 1. The Department did not pass on the constitutionality of the tax, saying this was outside of its authority; it denied Griffin's refund claim. Griffin appealed the Department's determination to the Indiana Tax Court, asking the court to declare the HCI tax unconstitutional, illegal, and in excess of statutory authority. Griffin also sought an injunction preventing collection of the tax. Lake County joined in the petition as an interested party.

Following cross-motions for summary judgment, the Tax Court ruled (1) that the HCI tax is a state tax, not a local tax, (2) that the HCI rate formula is not limited by other code provisions limiting property tax

---

1. *See* Ind.Code § 12–16–14–3 (1998) for an explanation of the formula each county must apply in order to impose the HCI property tax levy.

rates generally, and (3) that because the HCI tax rates vary from county to county, that variance results in property not being taxed in a uniform or equal manner as required under Article 10, § 1. *Griffin*, 765 N.E.2d at 722–24. Consequently, the Tax Court granted Griffin partial summary judgment and reversed the Department's final determination. *Id.* at 724.

Having decided to apply its holding prospectively only, the Tax Court denied Griffin's request for a refund. *Griffin v. Dep't of Local Gov't Fin.*, 770 N.E.2d 957, 960 (Ind.Tax Ct.2002). It also enjoined assessment or collection of the HCI tax but stayed its injunction until January 1, 2003, to allow the State reasonable time to revise the HCI tax rate or consider other solutions. *Id.* Accordingly, a taxpayer was not entitled to a refund of the HCI taxes due and payable before January 1, 2003.

Both sides petitioned for review. The Department challenges the ruling that the HCI tax is unconstitutional. (Department Br. at 10–11.) Griffin and Lake County request a review of the limited remedy the Tax Court afforded. (Pet'r Br. at 2.) Griffin also challenged the HCI tax as violating Ind. Const. art. 1, § 23, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The Tax Court did not address these other claims, presumably because it viewed the Article 10 claim as dispositive.

Having granted review, we deem the issues to be: (1) whether Ind.Code § 12–16–14–1 *et seq.*, which establishes the HCI tax, violates Article 10, § 1; (2) whether the Tax Court erred in refusing to order a refund; and (3) whether the Tax Court

erred in staying its injunction against collection of the HCI tax. Our decision on the first of these resolves the other two. We begin with a brief review of Hospital Care for the Indigent.

## I. What is the HCI Program?

We recently had occasion to analyze the structure and operation of the HCI program in *State Bd. of Tax Comm'rs v. Montgomery*, 730 N.E.2d 680, 681 (Ind. 2000). Before 1986, each of Indiana's counties bore all responsibility for indigent health care. *Id.* The legislature enacted the HCI provisions in 1986 and then recodified them in 1992 at Ind.Code §§ 12–16–2–1 to 12–16–16–3. *Id.* The general purpose was to provide cost-free emergency medical care to indigent patients who did not qualify for Medicaid. *Id.* The HCI program transferred the administration of indigent health care to the State and imposed an "HCI tax levy" to finance it. *Id.*

Under the present arrangement, the Department must "review each county's property tax levy under this chapter and ... enforce the requirements of this chapter with respect to that levy." *Id.* (citing Ind.Code § 12–16–14–4 (1998)). Each county annually imposes the levy as a property tax for that county and collects it like other state and county *ad valorem* property taxes. Ind.Code § 12–16–14–2 (1998). Unlike the general property tax levy,[2] the Indiana Code prescribes the amount of the HCI levy for each county; it is the previous year's levy increased by the percentage of growth in assessed value of all property in the state. *Montgomery*, 730 N.E.2d at 681[3]. Certain statutory

---

**2.** "Levy" is a term used to describe the aggregate dollar amount of property taxes imposed to fund a given operation of local government. The levies imposed under the general property tax are subject to review by the

Department. *See* Ind.Code §§ 6–1.1–17–1 to 20 (1998).

**3.** This description, although not precisely correct, is adequate for purposes of this opinion

limits on property tax rates may be exceeded "[t]o meet the requirements of the county hospital care for the indigent fund." *Id.* (citing Ind.Code § 6–1.1–18–3(7) (1998)).

The act establishes an HCI fund in each county. *Montgomery,* 730 N.E.2d at 681. The balance of each county's HCI fund is transferred to the state HCI fund. *Id.* The State administers the HCI program and reimburses providers of emergency medical care to the indigent for their expenses from the state HCI fund. *Griffin,* 765 N.E.2d at 720–21 (citing Ind.Code § 12–16–14–8 (1998)). In 1993, the legislature modified the HCI program to secure additional federal Medicaid funds by using $35 million of the state HCI fund as matching money. *Id.* at 721.

The initial HCI levy for each county had been set at the average of its indigent hospital care expenditures over 1984–86, with certain adjustments. *Montgomery,* 730 N.E.2d at 681. The HCI tax rate thus varies from county to county because of the difference in the counties' historical expenditures on hospital services for the indigent during the years immediately before the HCI program was enacted.

## II. Taxation is Specially Legislative and Deference is Substantial

■ Every statute stands clothed with the presumption of constitutionality until clearly overcome by a contrary showing. *Boehm v. Town of St. John,* 675 N.E.2d 318, 321 (Ind.1996). The party challenging the constitutionality of the statute bears the burden of proof, and all doubts are resolved against that party.

*Id.* at 321. If there are two reasonable interpretations of a statute, one of which is constitutional and the other not, we will choose that path which permits upholding the statute. *Id.*

■ Taxation is a power purely within the province of the legislature. *Board v. Holliday,* 150 Ind. 216, 49 N.E. 14 (1898); *Board of Comm'rs v. Adler,* 77 Ind.App. 296, 133 N.E. 602 (1922). As the Department notes, the legislature has wide discretion in taxing for the general welfare. *See Yarger v. Raver,* 237 Ind. 88, 143 N.E.2d 662 (1957); *Morgan County v. Seaton,* 122 Ind. 521, 24 N.E. 213 (1890). The power of the legislature regarding matters of taxation is unlimited, except as restricted by the Constitution. *Brown v. Baltimore,* 186 Ind. 81, 115 N.E. 86 (1917).

■ One constitutional restriction on this legislative power is Article 10, § 1, which provides, "The General Assembly shall provide, by law, for a *uniform* and *equal* rate of property assessment and taxation and shall prescribe regulations to secure a just valuation for taxation of all property, both real and personal." (Emphasis added.) These provisions seek to distribute the burden of taxation upon the principles of uniformity, equality, and justice. *Davis v. Sexton,* 210 Ind. 138, 200 N.E. 233 (1936).

■ Uniformity in rate, as required by the Constitution, means that the same rate shall apply alike to all in any given taxing district. *Henderson v. London & Lancashire Ins. Co.,* 135 Ind. 23, 34 N.E. 565, 568 (1893). This means that as a

---

and hopefully more easily understood than the statutory formulation:

Each county shall impose a[n][HCI] property tax levy equal to the product of:

(1) the [HCI] property tax levy imposed for taxes first due and payable in the preceding year; multiplied by

(2) the statewide average assessed value growth quotient, using all the county assessed value growth quotients determined under Ind.Code 6–1.1–18.5–2 for the year in which the tax levy under this section will be first due and payable.

Ind.Code § 12–16–14–3 (1998).

general proposition, Article 10 requires that a tax for a state purpose must be uniform and equal throughout the state, a tax for a county purpose must be uniform and equal throughout the county, and so forth. *Board of Comm'rs of Jackson County v. State*, 155 Ind. 604, 58 N.E. 1037, 1039 (1900); *Bright v. McCullough*, 27 Ind. 223, 230 (1866).

■■■ What shall constitute a taxing district, and whether it may be confined to, or disregard, boundary lines of counties, townships, or municipalities, is a matter wholly within the discretion of the General Assembly. *Brown*, 115 N.E. at 86. The subjects and methods of taxation are legislative matters, and cannot be disturbed so long as the method prescribed is applicable alike to all within the prescribed class. *Davis*, 200 N.E. at 241. What is important is that there be uniformity and equality of rate as to those of the same class. *Id.*

**Article 10 has been largely aimed at assessments.** The history surrounding the drafting and ratification of the Constitution suggests that while Article 10 applies to assessments and taxation, *assessment* was the central concern of its proponents. Delegate Daniel Read of Monroe County, in proposing Section 1, stated:

> It appears to me, that no provisions are more proper for a Constitution, than those requiring *equality of assessment* for purposes of taxation. The duty of the Legislature to devise a system which will secure such equality and which will cause all the property of the State to be brought under taxation, should be held forth in the Constitution.

Comments of Delegate Read (Dec. 3, 1850), Debates in Indiana Convention, 1850, Vol. 1, p. 941 (emphasis added). Including the requirements of uniformity and equality in assessments and taxation ele-

vated and preserved their importance as fundamental principles. *Id.; see also, Boehm*, 675 N.E.2d at 323.

■■■ We reiterated the thrust of Article 10 in *Kerr v. Perry School Twp.*, 162 Ind. 310, 70 N.E. 246, 247 (1904): "This provision of our fundamental law clearly applies to assessments and taxation, and does not profess to control the expenditure of money arising out of any assessment or taxation of property. It deals with the uniformity and equal rate of assessment and taxation of property within the taxing district or locality in which the particular tax is levied." Thus, when the rate of property assessment is uniform throughout a taxing district, the constitutional mandate of uniform and equal taxation has been fulfilled. *South Bend Public Transportation Corp. v. City of South Bend*, 428 N.E.2d 217, 223–24 (Ind.1981).

Delegate Read stated: "There is hardly a subject connected with our State government, which has attracted more general attention among the people, than the existing inequality in the assessment and taxation of property." *Id.* In proposing the inclusion of Article 10, § 1 in our Constitution, Delegate Read sought to rectify the "manifest injustice" that results in "permitting property, in the hands of the wealthy, which ought to be taxed as other property, to escape taxation altogether, or to be taxed only on a very small part of its value." *Id.* at 946. Such comments illustrate that the mischief being addressed was chiefly unequal assessment of properties, not the rates between counties or governmental units once the assessment was done. *See e.g., Boehm*, 675 N.E.2d at 322–23 (quoting comments of Delegate Borden (Dec. 4, 1850), Debates in Indiana Convention, 1850, Vol. 1, p. 946, 950).

In the end, of course, the Convention chose language covering both assessment

and taxation. Legislative history suggests intent to apply a more muscular restraint on assessment.

### III. The HCI Tax is Neither "Local" Nor "State"

As the parties to this case have done, much of the caselaw about Article 10 has analyzed the dispute at hand by inquiring whether the tax at issue is "state" or "local." Once this question has been answered, the disposition has flowed from the notion that state taxes must be uniform throughout the state and that local taxes must be uniform within the jurisdiction in which they are levied.

Of course, Article 10 does not even use the words "state" or "local." Instead, it commands that assessment and taxation be *"uniform and equal."*

Article 10 challenges have typically involved taxes levied and spent by a locality or by the state government. The HCI tax is levied to fulfill a responsibility shared by the state and the county. Indeed, this joint effort produces additional funds from the federal government to be used also for the general welfare of the people.

■■ The nature of a tax is determined by its operation and incidence rather than by legislative title or designation. *See Wright v. Steers,* 242 Ind. 582, 179 N.E.2d 721 (1962). On this basis, the HCI tax cannot be simply classified as a "local" or "state" tax because the facts surrounding the tax and its operation demonstrate that it is part of a combined effort by local, state, and federal governments.

As the Department observes, financing health care for indigent persons has historically been recognized as a local responsi-

bility. (Department Br. at 15.) During the early decades under our present Constitution, this Court noted, "Every county shall relieve and support all poor and indigent persons lawfully settled therein, whenever they shall stand in need thereof." *Seaton,* 24 N.E. at 213.[4]

It is each county's responsibility to establish an HCI fund consisting of a property tax levy in each county. Ind.Code § 12–16–14–1. While the state manages the fund, the county fiscal body imposes the tax annually on all the taxable property of the county and collects it as other state and county *ad valorem* property taxes are collected. Ind.Code § 12–16–14–2.

Finally, the HCI tax now plays a role in Medicaid, itself a joint activity of the federal and state governments. Essentially, the federal government reimburses the states for Medicaid expenditures on the basis of a formula tied to the per-capita income in each state. *Ashley County Medical Center v. Thompson,* 205 F.Supp.2d 1026, 1030 (E.D.Ark.2002).

The federal share of Medicaid expenditures, known as "Federal Financial Participation," or "FFP," varies from fifty to eighty-three percent of a state's total Medicaid expenditures. *Id.* The Medicaid statute requires only that each State plan "provide for financial participation by the State equal to not less than 40 per centum of the non-Federal share." *Id., citing* 42 U.S.C. § 1396a(a)(2).

As the *Thompson* court observed, local units of government are also allowed to fund Medicaid. "The portion of a State's Medicaid expenditures not covered by federal matching funds is properly referred to

---

4. The legislature has enacted many statutes in addition to the HCI statute that finance medical and other welfare costs for indigents at county expense. *See e.g.,* Ind.Code § 12–17–3–1 *et seq.* (1998) (services for care of dependent and delinquent children and CHINS through county welfare fund); Ind.Code § 12–26–10–4 (1998) (county general fund to bear costs of care for indigent individuals pending admission to a state institution).

as the 'non-Federal share,' and sixty percent of the non-Federal share of a state's Medicaid expenditures may be funded by sources other than the State." *Id.*

The combined efforts of state, local, and federal governments to advance the welfare of the indigent suggest to us that the HCI tax is not solely for state or county purposes, but to satisfy a joint responsibility. It seems inadequate to test the constitutionality of the HCI program simply by asking whether the property tax portion is "state" or "local."

### IV. Local Share Is Based On Experience

The Tax Court noted that Indiana's ninety-two counties have seventy-two different tax rates. *See Griffin,* 765 N.E.2d at 720. The reason for this, of course, is because the HCI property tax levy is based on an extrapolation of historical HCI costs in each particular county. The intended purpose of basing the HCI property tax classification system on such historical costs was to impose burdens in just proportions to the benefits received by each county's residents. (Amicus Curiae Br. at 2.)

Before HCI, a county was responsible for the "necessary costs" of care, but there was no limitation on the amount of "necessary costs" a county might have to bear. Ind.Code § 12–5–6–6 (1998). Taxpayers who lived in a county with a higher percentage of indigent residents risked responsibility for very significant expenses for medical care.

Because of this open-ended burden, the legislature made certain changes to the program in 1986 so as to reduce the counties' burdens. (Amicus Curiae Br. at 5–6.) For the first time, the amount of a county's financial obligation was capped.[5] *Id.* at 6.

The amount of a county's financial responsibility for indigent medical care was calculated via a formula that took into account *that county's* actual HCI expenditures from 1984–1986.[6] *Id.* By definition, the limit of a county's financial obligation under the HCI program was not influenced by the HCI payment experience of any other county. *Id.* This formula remains in place today.[7]

■ **Local Taxes Always Vary.** The theory of every republican government is that taxes should be levied equally, but this is impossible, even in the simplest states of society. *State ex rel. Lewis v. Smith,* 158 Ind. 543, 547, 63 N.E. 25, 27 (1902). The difficulty becomes more and more pronounced as civilization becomes more complex, because the circumstances and pursuits of the people become more diversified. *Id.* " 'A just and perfect system of taxation,' said Chancellor Kent, 'is yet a desideratum in civil government.' " *Id.* (*citing* 2 Kent, Comm. 332). " 'Perfectly equal taxation,' it has again been said, 'will remain an unattainable goal as long as laws and government and men are imperfect.' " *Id.*

■ We recognized in *Bright,* 27 Ind. at 229–30, that the wants of towns and cities cannot be equal. Some require a higher, and some a lower, rate of taxation. *Id.; see also, Robinson v. Schenck,* 102 Ind. 307, 1 N.E. 698 (1885). Article 10

---

5. *See* Ind.Code §§ 12–5–6–6(a)–(c) (1986).

6. *See* Ind.Code §§ 12–5–6–16(c), (e) (1986), as added by P.L. 16–1986 § 72, eff. July 1, 1986.

7. *See* Ind.Code § 12–16–14–3, as revised by P.L. 283–2001, § 27, eff. July 1, 2002. The amount of the HCI tax levy for each county is annually increased by a percentage of growth in assessed value of all property in the state. *Montgomery,* 730 N.E.2d at 681.

simply intended that the uniformity and equality of rate should be co-extensive with the territory to which the tax applies. *Bright,* 27 Ind. at 229–30. In like fashion, the wants of counties cannot be equal either, thus requiring varying rates of taxation among counties.

Even Delegate Read acknowledged the aspirational nature of requiring *uniformity and equality* by implying that he did not expect the full achievement of absolute and precise exactitude: "I do not suppose, sir, that these inequities can be corrected by the Constitution, nor even wholly by the laws. But I would lay down the rule in the Constitution." Comments of Delegate Read (Dec. 3, 1850), Debates in Indiana Convention, 1850, Vol. 1, p. 946.

■ Article 10 "does not require that the rate of assessment shall be uniform and equal for all purposes throughout the State; and we think its meaning clearly is that the rate of assessment and taxation must be uniform and equal throughout the locality in which the tax is to be levied." *Bright,* 27 Ind. at 230. Based on this precept, we are hard pressed to see the constitutional evil in a program involving money from three levels of government that sets the rate of local contribution so that it varies in harmony with expenses for indigent health care in the local area. Pursuant to its broad discretion, the General Assembly properly decided that, for purposes of financing indigent health care, the counties were *not* similarly situated and varied the tax burden accordingly.

We addressed the issue of varying taxes among towns and counties in *Kent v. Town of Kentland,* 62 Ind. 291, 292 (1878). In that case, we upheld statutes that authorized cities to collect a school tax of persons who lived outside the city limits, if their children were sent to school within the city. We held that this system did not conflict with Article 10, because through-

out the state it operated alike on all persons in the same circumstances. *Id.* at 292. Justice Horace Biddle wrote:

We can see nothing unconstitutional in any of these acts. They are "uniform and equal" in the rate of assessment and taxation, operate throughout the State, and upon all persons in the same circumstances, alike. Of course, the facts upon which these laws act are not equal and uniform, but continually vary; and a municipal law can no more act without facts, than the law of gravitation can act without matter. The laws, by which counties and townships levy and collect taxes for their own use, are uniform and equal, yet the rates of assessment and taxation in one county or township, as compared with another county or township, are not uniform and equal, and may vary from year to year. Those changes in fact do not affect the uniformity and equality of the law.

*Id.*

Similarly, in *Wright v. House,* 188 Ind. 247, 121 N.E. 433 (1919), we found no constitutional violation in a statute requiring the State and counties to share the expense of highway improvements in those counties. There, we stated:

The fund to be provided in any county under the provision of the act to pay its part of the costs of the improvement of highways is raised by a general tax on the property of the county levied and collected as other taxes are levied and collected. The fact that the tax rate in counties where extensive improvements are made under the law may be greater than the tax rate in other counties where no improvements are made, or in counties where the improvements thereunder are less extensive, does not signify that the rates of taxation are not uniform within the meaning of the Constitution. Each county is a separate

unit for the purpose of taxation, and it cannot be maintained that, within the county making the improvement, the tax levy is unequal.

*Id.* at 437.

■ By contrast to the present scheme of approximate balance between local tax burden and local benefit, Griffin proposes a single state-wide rate the revenue from which would be deployed wherever services were rendered. This would provide a mathematical equality of burden, of course. In light of the historic rule of local finance for local service in this field, we are not persuaded that the Constitution prohibits the legislature from matching burden with benefit.

## V. Principal Effect Has Been to Reduce Local Tax Burden

While Griffin complains about paying a higher HCI rate than some others do and about HCI funds being used to leverage federal Medicaid dollars, the net result has been to generate more money to aid the poor without provoking the higher property taxes the former system produced.

The legislature's 1993 decision to use some HCI revenue for this purpose is illustrative. Some $35 million per state fiscal year of the state HCI fund is now transferred to the Medicaid indigent care trust fund to be used to leverage federal Medicaid dollars.[8] P.L. 277–1993 Section 82; (*see also,* R. 694). Allowing these funds to go through the Medicaid program generates more money for medical care provided by Indiana hospitals by leverag-

ing approximately two additional federal dollars for every one local dollar contributed. (Department Br. at 8.) Undoubtedly, a portion of the additional Medicaid funds make their way to Lake County hospitals. The General Assembly decided that if this Medicaid revenue program generated more than $45 million in federal matching funds in a fiscal year, then the excess fund, up to $18 million, would be returned to the State HCI fund annually. P.L. 277–1993; (Department Br. at 8).

In 1995, the legislature revised the HCI program again eliminating the physical transfer of monies used to procure federal Medicaid matching funds back to the state HCI fund for payment of HCI hospital claims. Instead, it used the $35 million appropriated from the state HCI fund,[9] to make lump-sum payments variously referred to as "Medicaid payments to hospitals in lieu of HCI payments" or "HCI Add–On."[10]

Amounts remaining in the state HCI fund were to be used to reimburse non-hospital indigent care providers, *e.g.,* physicians. (Department Br. at 9.)[11] Under the 1995 amendments, the hospitals received lump sum payments in addition to their base in-patient payment rate. This was based on HCI payments during fiscal year 1992 divided by the hospital's total Medicaid patient days during that period. *See* Ind.Code § 12–15–15–8 (as amended 1995) (repealed 1998). Money in the HCI fund at the end of the state fiscal year may not revert to the state general fund. Ind. Code § 12–16–14–9. The 1995 changes

---

8. Federal law permits States to use state or local taxes or intergovernmental transfers as the state match for federal financial participation under Medicaid. 42 U.S.C. § 1396b(w)(6)(A). Federal law does not permit a selective tax on providers. *Id.*

9. *See* P.L. 340–1995, § 8.

10. *See* Ind.Code § 12–15–15–8 (as amended 1995) (repealed 1998); *see also,* S.R. at 3, submitted with the Department's Motion for Summary Judgment.

11. *See* S.R. at 6, submitted with the Department's Motion for Summary Judgment.

caused the HCI fund balance to grow to approximately $17 million.

Most subsequent legislative efforts have further ameliorated Griffin's complaint about his county's disproportionate share of HCI tax. The General Assembly reduced Lake County's share of the property tax levy by $4,000,000. Ind.Code § 12–16–14–3.4. It also reduced St. Joseph County's share by $1,000,000. Ind.Code § 12–16–14–3.7.[12]

The legislature added Ind.Code § 12–15–15–9 specifically aimed to address concerns about disparity in payments between some counties' HCI contributions and the reimbursements of providers within those counties. P.L. 126–1998 Section 5. This section, which is retroactive to the 1997–98 fiscal year, required the Family and Social Services Administration ("FSSA") to prepare a formula that "minimizes the difference between the aggregate amount paid under this section to all hospitals in a county for a state fiscal year and the amount of the county's HCI property tax levy for that state fiscal year." *Id.* Between the effects of federal leveraging and the impact of this formula, an even greater amount of money was returned to Lake County providers than to providers in other counties. Specifically, in April 1999, by operation of the HCI county equity payment methodology developed by FSSA, the State forwarded Lake County hospital providers HCI county equity payments to-

taling $6,757,188 for the State's 1998 fiscal year. (R. at 749.)

In its November 1992 report, the Indiana Commission on State Health Policy characterized the HCI program as "underdefined and misaligned." It noted:

> Indiana spent approximately $33 million in total county funds for providing emergency services under the Hospital Care for Indigent (HCI) Program.... The program is inadequate in addressing the health care needs of the uninsured in Indiana.... If Indiana were to use this money under the Medicaid program, the state would have approximately $66 million more to serve the health care needs of Indiana's uninsured....

Indiana Commission on State Health Policy, Hoosier Health Reform at 21–24 (Nov. 1992) (*quoted in* R.M. Haycox, *A year of Change for our Health Care System,* 1992 Survey of Recent Developments in Indiana Law, 26 Ind. L.Rev. 1003, 1012 (1993)). This is exactly what the legislature chose to do.

In the end, the question that is posed by the foregoing facts is: Aren't Griffin and his fellow property tax payers better off with the Medicaid leveraging than without it?[13] The question answers itself, but we will pause to lay out the answer anyway.

Lake County residents historically received much more HCI service than residents in other counties.[14]

---

**12.** In the 2001 legislative session, the General Assembly modified the HCI program and its funding formula. (Department Br. at 10.) This new legislation repeals the HCI program by 2003 and institutes an uninsured parents program. *Id.*

**13.** Enjoining the collection of the HCI tax would result in an immediate loss of $50 million in HCI revenue and cause the further loss of $126 million in federal Medicaid funds. *Id.*

**14.** The following table demonstrates Lake County's proportionate share of the total HCI claims* paid for service dates 1992–1998:

| Service Dates | Lake Co. HCI Claims Paid | Total HCI Claims Paid | Lake Co. % of Total HCI Claims |
|---|---|---|---|
| 1992 | 8,775,191 | 27,331,727 | 32% |
| 1993 | 2,670,427 | 6,993,488 | 38% |
| 1994 | 4,528,888 | 15,051,332 | 30% |

Moreover, the HCI program cannot be examined in isolation because disproportionate share hospital ("DSH") payments, a related part of Medicaid, are also relevant here. Through DSH, Lake County providers have received significantly more reimbursements than those in many other counties. (R. at 695–96.) When DSH is taken into account, the total benefits received outweigh the tax levy. For example, in state fiscal year 1995, Lake County hospitals and providers received $27,755,978 in DSH and HCI reimbursements compared with an HCI tax levy of $14,320,445. (R. at 699, 708.) For state fiscal year 1996, Lake county hospitals and providers received $26,928,506 in DSH and HCI reimbursements compared with an HCI tax levy of $15,242,100. *Id.*

Furthermore, during the fiscal year 1998, the total amount collected by the HCI program statewide was $144,313,918. (R. at 148.) The total amount of HCI and Medicaid reimbursements paid statewide during that fiscal year was $52,231,742. *Id.* During that period, Lake County taxpayers paid $16,931,455 in HCI tax. Of the reimbursements made during that year, however, $17,682,517 was allocated to Lake County. *Id.* Thus, Lake County ended with a positive balance for state fiscal year 1998 of $751,062.

In comparing the proportions of Lake County's HCI contributions and reimbursements with the statewide contributions and reimbursements, a differential of 4% exists. Nevertheless, as demonstrated above, Lake County has received more than what it has contributed. The HCI tax formula has thus been effective in allocating the tax burden according to the costs it has incurred. Put another way, the tax is proportionate to the expenses.

### Conclusion

As Justice John H. Gillett once observed, despite occasional imposition of disproportionate taxation, "the courts must admit that there exists in the general assembly a large measure of discretion in the enactment of a scheme of taxation." *Smith,* 63 N.E. at 27. In its broad discretionary authority, our legislature developed a "scheme of taxation" that takes into account the historical differences that exist among counties with respect to HCI costs and sends more funds for increased health care in local areas than property taxpayers pay. Given the high level of deference owed the legislature on matters of taxation, we are unable to say that the HCI system violates Article 10.

SULLIVAN, BOEHM, and RUCKER, JJ., concur.

DICKSON, J., dissents without separate opinion.

| | | | |
|---|---|---|---|
| 1995 | 481,569 | 976,647 | 49% |
| 1996 | 532,631 | 964,815 | 55% |
| 1997 | 653,327 | 1,103,046 | 59% |
| 1998 | 516,986 | 820,151 | 63% |

(*See* Amicus Curiae Br. at 20, n. 14); R. at 133–51. (*Note that effective July 1, 1993, "HCI claims" include only claims paid to physicians and ambulance providers under Ind.Code § 12–16–7.)